Barbara BROWN, Plaintiff,

v.

COUNTY OF SAN BERNARDINO, et al., Defendants.

NO. ED CV 15–294–CJC(E)

United States District Court, C.D. California.

Signed April 17, 2017

Barbara Brown, Sugarloaf, CA, pro se.

Dennis E. Wagner, Wagner and Pelayes LLP, Riverside, CA, for Defendants.

ORDER ADOPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

Pursuant to 28 U.S.C. section 636, the Court has reviewed the Third Amended Complaint, all of the records herein and the attached Report and Recommendation of United States Magistrate Judge. Further, the Court has engaged in a de novo review of those portions of the Report and Recommendation to which any objections have been made. The Court accepts and adopts the Magistrate Judge's Report and Recommendation.

IT IS ORDERED that Judgment shall be entered in favor of Defendants.

IT IS FURTHER ORDERED that the Clerk serve forthwith a copy of this Order, the Magistrate Judge's Report and Recommendation and the Judgment of this date on Plaintiff and counsel for Defendants.

REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

CHARLES F. EICK, UNITED STATES MAGISTRATE JUDGE

This Report and Recommendation is submitted to the Honorable Cormac J. Carney, United States District Judge, pursuant to 28 U.S.C. section 636 and General Order 05–07 of the United States District Court for the Central District of California.

BACKGROUND

On February 19, 2015, Plaintiff filed a pro se civil rights Complaint for damages pursuant to 42 U.S.C. section 1983. The Complaint named as Defendants the County of San Bernardino, the San Bernardino Sheriff's Department Big Bear Lake Station, Deputy Sheriff Scott Burton, Deputy Sheriff Travis Wijnhamer, Deputy Sheriff Tom Hollenbaugh and five "John Doe" Defendants. Plaintiff purported to sue the individual Defendants in their individual and official capacities.

On March 9, 2015, the Court issued an "Order Dismissing Complaint With Leave to Amend." On April 8, 2015 Plaintiff filed a First Amended Complaint.

On April 16, 2015, the Court issued an "Order Dismissing Certain Claims From First Amended Complaint." The April 16, 2015 Order dismissed without leave to amend and with prejudice Plaintiff's Monell claims[1] against the County of San Bernardino and the San Bernardino Sheriff's Department Big Bear Lake station, as well as Plaintiff's official capacity claims against the individual Defendants.

On June 29, 2015, Defendants Burton, Wijnhamer and Hollenbaugh filed a "Motion to Dismiss for Failure to State a Claim, etc." On August 3, 2015, Plaintiff filed an Opposition to the Motion to Dismiss. On August 19, 2015, the moving Defendants filed a Reply. On August 25, 2015, the Court issued an "Order Dismissing First Amended Complaint With Leave to

---

1. See Monell v. New York City Dep't of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Amend." On September 24, 2015, Plaintiff filed a Second Amended Complaint.

On October 7, 2015, Defendants filed a Motion to Dismiss the Second Amended Complaint. On December 11, 2015, Plaintiff filed an Opposition to the Motion to Dismiss. On December 26, 2015, the Court issued an "Order re Defendants' Motion to Dismiss Second Amended Complaint." The Order: (1) dismissed Plaintiff's state law claims without leave to amend but without prejudice; (2) dismissed Plaintiff's Second Amendment claims and Eighth Amendment claims without leave to amend and with prejudice; and (3) otherwise dismissed the Second Amended Complaint with leave to amend.

On January 25, 2016, Plaintiff filed a Third Amended Complaint, the operative pleading. The Third Amended Complaint names as Defendants Scott Burton, Tom Hollenbaugh and Travis Wijnhamer, sued in their individual capacities only ("Defendants"). On February 17, 2016, Defendants filed an Answer.

On October 31, 2016, Defendants filed a "Motion for Summary Judgment on Plaintiff's Third Amended Complaint" ("Motion for Summary Judgment"). On November 30, 2016, Plaintiff filed an "Opposition to Defendants['] Motion for Summary Judgment, etc." ("Opposition"). On December 14, 2016, Defendants filed a "Reply to Opposition, etc."

On January 3, 2017, Plaintiff filed "Plaintiff's Corrected Opposition to Defendants' Motion for Summary Judgment, etc." ("Corrected Opposition"). On January 9, 2017, Plaintiff filed a "Submission of Evidence in Support of Plaintiff's Corrected Opposition, etc." ("Plaintiff's Submission of Evidence"). On January 10, 2017, Defendants filed an "Objection to Plaintiff's Corrected Opposition, etc."

## SUMMARY OF ALLEGATIONS OF THIRD AMENDED COMPLAINT

The unverified Third Amended Complaint alleges:

On February 16, 2013, at 9:30 p.m. Plaintiff went to the apartment of her then boyfriend in Sugarloaf, California (Third Amended Complaint, p. 4, ¶ 7). Upon Plaintiff's arrival, an ex-boyfriend of Plaintiff who lived in a basement apartment at the same location began to argue with Plaintiff (id.). Plaintiff's then boyfriend, the apartment tenant, allegedly called the Big Bear Lake Sheriff's Department to have Plaintiff's ex-boyfriend escorted from the home for Plaintiff's protection "due to incident two days prior...."

At 10:15 p.m. Deputies Burton, Wijnhamer and Hollenbaugh arrived. Plaintiff and the tenant explained to the deputies that the man who had caused the disturbance had already fled and that "there was no problem anymore and plaintiff had a ride home when needed." Defendant Burton grabbed Plaintiff by the right arm and, assisted by Defendants Wijnhamer and Hollenbaugh, forcibly dragged Plaintiff outside of the residence, placed Plaintiff under arrest and handcuffed Plaintiff, "without plaintiff's consent nor boyfriend's command" and without a search warrant or court order. Plaintiff was not on probation or parole and was not a danger or threat to herself or others.

Burton, the arresting officer, drove Plaintiff to the San Bernardino main jail. Subsequently, while at the jail overnight, Plaintiff was stripped naked, strapped into a low chair and injected with an unknown drug. Plaintiff was left alone all night, strapped naked to the chair. Plaintiff did not consent to anything done to her during this ordeal.

The next morning, a deputy whom Plaintiff "believes" was Defendant Burton drove Plaintiff to the Arrowhead Regional Medical Center ["ARMC"] mental ward. Plaintiff was held at the hospital until February 21, 2013, without need and without Plaintiff's consent.

Defendant Burton had arrested Plaintiff for a violation of California Penal Code section 138(a)(1), obstructing or delaying an officer. The court dismissed the charge in the interest of justice.

Plaintiff alleges Defendant Burton violated Plaintiff's constitutional rights by arresting Plaintiff "without probable cause, a search warrant or court order, nor [sic] plaintiff's consent, nor (at) [sic] tenant's command." Deputies Wijnhamer and Hollenbaugh assisted Burton in the unlawful arrest. Plaintiff seeks damages for the cost of transportation back to her home and damages for mental and emotional distress, including nightmares, fear of driving at night and fear of law enforcement, in the total sum of $5,000,050.

## DEFENDANTS' CONTENTIONS

Defendants contend that probable cause existed to arrest Plaintiff and to detain and refer Plaintiff for mental health treatment. Defendants Burton and Hollenbaugh contend they were not involved in the decision to place Plaintiff in a "safety chair," to medicate her or to transport her to ARMC. Defendant Wijnhamer contends that he had no involvement in Plaintiff's arrest, her transportation to jail, the decision to restrain her, the decision to medicate her or the decision to transport her to ARMC. Defendants also contend they are entitled to qualified immunity.

## STANDARDS GOVERNING MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of offering proof of the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party's burden is met, the party opposing the motion is required to go beyond the pleadings and, by the party's own affidavits or by other evidence, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Miller v. Glenn Miller Productions, Inc., 454 F.3d 975, 987 (9th Cir. 2006). The party opposing the motion must submit evidence sufficient to establish the elements that are essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. at 322, 106 S.Ct. 2548.

The Court must "view the facts in the light most favorable to the non-moving party and draw reasonable inferences in favor of that party." Scheuring v. Traylor Bros., Inc., 476 F.3d 781, 784 (9th Cir. 2007). Where different ultimate inferences reasonably can be drawn, summary judgment is inappropriate. Miller v. Glenn Miller Productions, Inc., 454 F.3d at 988. "At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." Porter v. California Dep't of Corrections, 419 F.3d 885, 891 (9th Cir. 2005) (citation omitted).

A factual dispute is "genuine" only if there is a sufficient evidentiary basis upon which a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the lawsuit under governing law. Id.

"Evidence may be offered 'to support or dispute a fact' on summary judgment only if it could be presented in an admissible form at trial." Southern California Darts Ass'n v. Zaffina, 762 F.3d 921, 925–26 (9th Cir. 2014) (citing Fraser v. Goodale, 342 F.3d 1032, 1036–37 (9th Cir. 2003), cert. denied, 541 U.S. 937, 124 S.Ct. 1663, 158 L.Ed.2d 358 (2004)) (internal quotations omitted); see also Fonseca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial.'") (citations omitted). Conclusory statements are insufficient to defeat summary judgment. Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 950 n.9 (9th Cir. 2011) (en banc), cert. denied, 565 U.S.1200, 132 S.Ct. 1566, 182 L.Ed.2d 168 (2012).

## SUMMARY OF EVIDENCE

### I. Defendants' Evidence

With respect to the events in Sugarloaf, Defendants rely on their declarations and on audio recordings retrieved from the recording belts worn by Defendants Burton and Hollenbaugh. With respect to the events at the West Valley Detention center and ARMC, Defendants rely on Defendants' declarations, the declaration of San Bernardino County Deputy Sheriff Gennifer Livingston and excerpts from the deposition of Dr. Mailan Pham. All of this evidence, which is overlapping and somewhat repetitive, is summarized below.

### A. Declaration of Scott Burton

In his Declaration, Defendant Burton states:

On February 16, 2013, at approximately 9:46 p.m., Burton responded to a report of a domestic disturbance at the residence of Jonathan Sprecher in Sugarloaf, California. When Burton arrived, he heard a female and a male arguing inside the residence. The female spoke loudly in an argumentative tone to the male and called him a "faggot." The door was ajar and, through the doorway, Burton saw a woman later identified as Plaintiff standing over Sprecher, who was seated on the couch.

Burton asked Plaintiff to come outside so that Burton could separate her from Sprecher and get their respective stories separately. Plaintiff responded: "I'm not going to jail. Fuck you." Deputy Hollenbaugh arrived and Burton asked Plaintiff to go outside and talk to Hollenbaugh so Burton could interview Sprecher. Plaintiff said, "I'm not going nowhere." Burton attempted to explain again that Burton needed to get Sprecher's report concerning his 911 call. Plaintiff refused to leave or to permit Burton to speak to Sprecher alone. Plaintiff said Sprecher had not asked her to leave, but Sprecher said he had done so and wished she had left sooner.

Burton asked Plaintiff for her name, but she refused to speak to him or to provide her name. Plaintiff began telling Sprecher loudly to take her home. Burton asked Plaintiff several times for her name, but she refused and continued to tell Sprecher to take her home. Plaintiff was smoking a cigarette and Burton asked her several times to put it out because she was gesturing so elaborately Burton was concerned he could get burned. Sprecher brought an ashtray, but Plaintiff initially refused to put the cigarette out even then. Plaintiff put the cigarette out only after Defendant Hollenbaugh came close and gave her a "stern order" to do so.

Plaintiff then began making paranoid statements, accusing Burton of killing Christopher Dorner[2] and saying Burton

---

2. In February of 2013, former Los Angeles police officer Christopher Dorner shot four

would kill Plaintiff like he killed Dorner. Sprecher tried to coax Plaintiff to calm down, but she became increasingly more agitated and continued to refuse to cooperate. When Burton put his hand on Plaintiff's shoulder to direct her out of the residence, Plaintiff pulled away. Burton explained to Plaintiff she would have to leave the residence so the deputies could talk to her. Burton told Plaintiff to calm down. Plaintiff refused to leave the residence unless Sprecher gave her a ride home. Sprecher told Plaintiff that he could not take Plaintiff home because she would not stop screaming and that she needed to calm down. Burton and Hollenbaugh repeatedly asked Plaintiff to calm down so they could get her information and take her home, but she refused to calm down and she continued screaming. Because Plaintiff continued to resist and disobey Burton's commands, Burton placed her in a rear wrist lock and removed her from the residence. Burton told Plaintiff she was not being arrested, but she was not cooperating and the deputies needed to get her outside to speak with her separately. Plaintiff was handcuffed and allowed to sit on a retaining wall outside Sprecher's front door.

Burton then spoke to Sprecher while Hollenbaugh tried to get Plaintiff's side of the story. Burton heard Plaintiff yelling at Hollenbaugh, cursing him, telling him to shut up and screaming at the top of her lungs. Sprecher told Burton that Plaintiff had been drinking and had drunk too much, and that she became like this when she drank too much. Sprecher said Plaintiff was bi-polar or "fucking schizo." Sprecher said Plaintiff had been slapping Sprecher and that Sprecher's roommate Rodger, who was Plaintiff's former boyfriend, had tried to stop Plaintiff. Sprecher said Rodger left when Sprecher called police. During the entire time Burton was trying to talk to Sprecher, Plaintiff was yelling at Sprecher to take her home, screaming loudly and creating a disturbance. Sprecher asked Plaintiff to be quiet and calm down, but Plaintiff either could not calm herself or refused to do so. Burton would have allowed Sprecher to take Plaintiff home, but Plaintiff would not calm down and increasingly became louder, more agitated and more aggressive. Although Sprecher repeatedly asked Plaintiff to calm down, she just kept yelling that the deputies were going to kill her and kept insisting that Sprecher take her home. Sprecher told Burton Plaintiff's name because Plaintiff had refused to give her name to Burton. Sprecher told Plaintiff that he could not take her home in the condition she was in and that he would not take her to his car. Plaintiff kept yelling at Sprecher. Burton asked Sprecher if Sprecher wanted to try to walk with Plaintiff, and Sprecher responded: "Well look at her." Plaintiff was completely out of control and could not, or would not, calm down. Burton considered submitting Plaintiff for a "5150 application." [3] Because Plain-

---

people and wounded three others in a series of shootings generally aimed at law enforcement personnel. On February 12, 2013, Dorner died during a standoff with police at a cabin near Big Bear Lake, California, during which Dorner shot and killed a San Bernardino Deputy Sheriff. See "Christopher Dorner shootings and manhunt," Wikipedia, https:// en.wikipedia.org/wiki/Christopher_Dorner_ shootings_and_manhunt (last visited March 1, 2017).

3. California Welfare and Institutions Code section 5150(a), discussed below, authorizes a peace officer, among others, to take a person into custody for up to 72 hours for assessment and evaluation if there is probable cause to believe that the person, as a result of a mental health disorder, is "a danger to others, or to himself or herself, or gravely disabled."

tiff's behavior was so irrational, Burton believed Plaintiff presented a danger to herself or others and appeared unable to control herself to the point that she could not care for herself.

Burton, Hollenbaugh and Sprecher continued to attempt to calm Plaintiff down. Burton asked Plaintiff what she had been drinking, but Plaintiff refused to answer the deputies' questions and repeatedly accused them of trying to kill her. At one point, Sprecher suggested taking Plaintiff home to "sleep it off," but then Sprecher said that no one was at her home and that sometimes she went out and yelled in the street, which caused Burton further concern for Plaintiff's safety and the safety of others. Burton asked Sprecher to try to get Plaintiff to calm down, but Sprecher was unable to do so. Burton could not take Plaintiff home and leave her in that condition.

Burton, Hollenbaugh and Sprecher walked Plaintiff down to Burton's patrol car. Sergeant Mariedth arrived at some point as the other three were trying to put Plaintiff into the patrol car. Plaintiff was resisting and pleading with Sprecher, saying the deputies were going to kill her. Plaintiff appeared to be unable to control herself. Sprecher said Plaintiff could not stay at his house.

Burton arrested Plaintiff for a violation of California Penal Code section 148(a)(1). Plaintiff, already handcuffed, was placed in the patrol car. Burton transported Plaintiff to the Big Bear jail for booking, but upon arrival Plaintiff was still agitated and uncooperative. The Big Bear jail could not accept Plaintiff due to her behavior and her prior history of an "unusual behavior classification." The Big Bear jail is not authorized to accept individuals with this classification. Burton told Plaintiff he would have to take Plaintiff to the West Valley Detention Center. Plaintiff then attempted to kick out the patrol car window, which necessitated placing her in leg restraints.

At the West Valley Detention Center, Burton intended to book Plaintiff and cite her, but she continued to be physically resistive and uncooperative and refused to sign the citation, so Burton completed a probable cause declaration concerning Plaintiff. Burton then left Plaintiff in the custody of the jail deputies and nurses and thereafter had no further contact with Plaintiff. Burton has no personal knowledge concerning Plaintiff's allegations that she allegedly was placed in a restraint chair, that her clothes allegedly were removed, that she allegedly was administered medication or that she allegedly was transported to ARMC.

At the time Burton arrived at the scene of the incident, he activated his belt recorder. Attached to Burton's declaration is a CD of the recording, as well as a transcript which accurately reflects what was captured on the recording.

### B. Declaration of Tom Hollenbaugh

In his Declaration, Defendant Hollenbaugh states:

On February 16, 2013, Hollenbaugh responded to a 911 call from a man reporting a domestic disturbance in Sugarloaf, California. Upon arrival, Hollenbaugh encountered Defendant Burton at the residence, a small cabin with a very small front room. Hollenbaugh and Burton approached the residence and saw Plaintiff standing over Sprecher, the reporting party, who was seated on a couch. Plaintiff was arguing with Sprecher. The deputies attempted to interview Plaintiff and Sprecher separately. Burton told Plaintiff to go outside and speak with Hollenbaugh, but Plaintiff refused to do so. Plaintiff was smok-

ing a cigarette and both deputies asked her to put it out because she was flailing her arms and risked burning herself or the deputies. The deputies had to tell Plaintiff several times to put out the cigarette because she ignored their directives.

Plaintiff impeded the investigation of the 911 call by refusing to allow Burton to speak to Sprecher in private. Plaintiff ignored Burton's verbal commands to cooperate. When Burton placed his hand on Plaintiff's shoulder to direct her outside, she pulled away. Burton then handcuffed Plaintiff for her own safety to remove her from the residence and take her outside so she could speak to Hollenbaugh. Burton told Plaintiff that he was not arresting her and that he just needed to get her outside so he could speak to Sprecher. Plaintiff sat on a block wall while Hollenbaugh attempted to interview her. Hollenbaugh asked Plaintiff her name, and she said, "None of your damn business." When Hollenbaugh repeated his request, Plaintiff said, "None of your Goddamn business, I'm not driving Asshole." Plaintiff yelled at Hollenbaugh to leave her alone and began screaming loudly for Sprecher to give her a ride home. When Hollenbaugh attempted to get Plaintiff's side of the story, Plaintiff said, "Fuck you." At one point as Hollenbaugh was trying to speak to Plaintiff, Plaintiff said, "Fucking shut up, fucking shut up you motherfucker Goddamn fucker." Plaintiff then said to Hollenbaugh in a whisper tone, "I hate you; I hate you Bitch, I'll kill you." When Hollenbaugh asked Plaintiff how much she had to drink, Plaintiff loudly said, "Fuck you."

Plaintiff was continually uncooperative and would not answer Hollenbaugh's questions. Plaintiff's behavior was irrational and belligerent, and she became increasingly paranoid. She began accusing Burton and Hollenbaugh of trying to kill her. The deputies responded by saying they were not going to kill Plaintiff or hurt her, but nothing they said or did calmed her down. Sprecher also was unsuccessful at calming Plaintiff down. Sprecher vacillated between wanting to take Plaintiff home and not wanting her in his car. Sprecher told Plaintiff he did not want her in his house and wanted her to leave. Sprecher told the deputies that Plaintiff lived alone and there was no one at her house to look after her. Sprecher said that, even if he took Plaintiff home, he would not remain with her. He also said that, when Plaintiff drank too much, she went out into the street and yelled.

It was dark and very late, and Plaintiff was in no condition to be left home alone. Plaintiff had refused to cooperate and had impeded the investigation and the performance of the deputies' lawful duties. Finally, Burton arrested Plaintiff for wilfully resisting, interfering and delaying an officer in the performance of his duties.

Hollenbaugh followed in his patrol car as Burton drove Plaintiff to the Big Bear station. The station said that they could not book Plaintiff there due to her prior history of unusual behavior and that she would have to be booked at the West Valley Detention Center. When Burton told Plaintiff he had to take her to the West Valley Detention Center, Plaintiff became physically combative and began kicking at the windows of the patrol car. Hollenbaugh assisted Burton in placing a restraint on Plaintiff's legs "so she wouldn't kick out the windows." Burton then left with Plaintiff.

Hollenbaugh did not escort Plaintiff to the West Valley Detention Center or to ARMC. Hollenbaugh was not present at the West Valley Detention Center when Plaintiff was taken there, or at any other time that night or morning.

At the time of Hollenbaugh's initial contact with Plaintiff, Hollenbaugh activated his belt recorder. Attached to Hollenbaugh's declaration is a CD of the recording, as well as a transcript which accurately reflects what was captured on the recording.

## C. The Belt Recordings

The Court has listened to the CD's of the belt recordings and has reviewed the transcripts. The recording from Burton's belt recorder is approximately 21 minutes long, and that from Hollenbaugh's belt recorder is approximately 10 minutes long. The transcripts accurately reflect the audio on the recordings. The recordings correlate substantially with the declarations of Defendants Burton and Hollenbaugh.

The recordings directly contradict Plaintiff's statements in opposition to the Motion for Summary Judgment in various respects, as discussed herein. The recordings reveal Plaintiff to have been abusive, irrational and out of control during the encounter with the deputies. In tone, Plaintiff alternated between screaming inappropriately and muttering and wailing unresponsively. In tone, the deputies remained calm at all times.

### 1. Burton's Recording

Burton's recording begins with the following exchange between Plaintiff ("BB") and Sprecher ("JS"):

BB: ___ admit it faggot ... No .. you became upset at me.

JS: You're way better at manipulating ___ . . .

BB: ___ .. why tell him instead of me?

JS: No

Burton then asked, "What's going on you guys?" Plaintiff said that Sprecher had beaten her up a few months before and that she had done nothing wrong. Burton told Plaintiff to go outside so he could get her story. Plaintiff responded that she was not going to jail. Burton said, "I'm not saying you're going to jail." Plaintiff responded, "Fuck you. He's gonna give me a ride home right now." Burton again asked Plaintiff to step outside so Burton could talk to Sprecher and Burton's partner could talk to Plaintiff. Burton said he was giving Plaintiff "one more chance." Plaintiff countered that she was not going anywhere and that Sprecher had not asked her to leave. Sprecher said, "I was asking you to leave. I wish you'd have left sooner."

When Burton asked Plaintiff's name, she said she was "okay" and "fine" and told Sprecher to take her home. Burton said Plaintiff was "testing [his] patience" and told Plaintiff to come outside and to put her cigarette out. The officers obtained an ashtray from Sprecher and repeatedly told Plaintiff to put the cigarette out. Plaintiff said that she wanted a ride home and that the officers had killed Dorner. When Plaintiff repeatedly asked Sprecher for a ride home, Sprecher told her to "chill out" and said it was up to the officers. Plaintiff said, "Don't arrest me" and Burton responded, "We aren't arresting you." Burton told Plaintiff she was "freaking out" and Hollenbaugh told her she was not cooperating. Burton said, "You're freaking out, I told you to step outside to get your story and you won't even tell me your name." Hollenbaugh added, "We're trying to figure out what's going on and you won't speak to us." Plaintiff shouted, "I NEED A RIDE HOME!"

Sprecher told the deputies that Plaintiff had too much to drink while with a friend, and that, when Plaintiff drank too much, "she goes like this." Sprecher said, "It's just bi-polar or fucking schizo I don't know, but it has to do with booze and it wasn't with me...." Plaintiff said to Hollenbaugh, "None of your Goddamn business" and "I'm not driving Asshole."

Sprecher told Burton where Plaintiff lived. Burton said, "Well, she's probably gonna be for drunk in public at least." Burton asked Sprecher, "Did it get physical?" to which Sprecher replied, "Oh Jesus Christ." Burton said that the deputies could not even talk to Plaintiff and that Plaintiff was "gonna make us arrest her." Sprecher said, "She was slapping us and he [Plaintiff's ex-boyfriend Rodger] was helping me to keep her from slapping me." Sprecher said that Rodger was Sprecher's roommate and Plaintiff's former boyfriend and that Rodger had left because "he didn't wanna obviously have the cops come. . . ."

Burton said he was going to help his partner get Plaintiff in the car. Plaintiff loudly demanded that Sprecher drive her home. Burton asked Plaintiff what she had drunk that night and whether she had taken medication. Plaintiff said, "Take these damn things off me he's giving me a ride home right now please." Burton said Plaintiff was not listening and Sprecher told her to calm down and listen to the officers. Burton started to say, "All we're trying to do is—"when Plaintiff interrupted, screaming that the officers had killed Dorner and she was "not gonna go down like he did." Plaintiff screamed, "BEFORE THEY KILL ME JONATHAN! GIVE ME A RIDE HOME!"[4] Plaintiff said the officers had guns and tasers and would kill her.

Sprecher said he would take Plaintiff home if she would "shut up." Plaintiff repeatedly yelled that the officers would kill her. Hollenbaugh told Plaintiff, "Barbara, we don't wanna hurt you." Burton said, "We didn't come to hurt you Barbara" and told Plaintiff she needed to calm down and that all he was trying to do was get her name. Burton said, "The only reason you are in cuffs is because you're not cooperating."

Plaintiff continued to demand a ride home. When Plaintiff said she broke no law, Burton said, "It's either gonna be drunk in public or it's gonna be a 5150." Plaintiff said, "I'm not in public I'm in a man's house." Sprecher offered to take Plaintiff home so she could "sleep it off." However, Sprecher said there was no one at Plaintiff's home but her cats and that, when Plaintiff was like this, she went out and yelled in the street. Hollenbaugh said, "We can't leave her at her house by herself like this—"Burton asked Sprecher to try to "talk some sense into her." Sprecher said he could drive Plaintiff home, but she would have to "stop with all the noise." Plaintiff said "they killed Dorner" and would kill her.

Burton asked Plaintiff if she was "okay in the head" or "suicidal." Plaintiff responded that the officers would kill her. Burton said, "We are not gonna hurt you," and "[t]he only reason we hurt people is if they're trying to hurt us." Plaintiff said she and Sprecher had just broken up recently and that she tried to talk things out but just wanted a ride home.

Sprecher and the officers began to lead Plaintiff down the back steps. Plaintiff again said the officers had killed Dorner and were going to kill her and demanded that Sprecher give her a ride home. Burton told Plaintiff that the deputies were trying to get Plaintiff to calm down, that Plaintiff had to walk and that the deputies did not want Plaintiff falling so she should watch her step. Burton asked Plaintiff for her identification, to which Plaintiff replied, "Damn it!" Plaintiff continued to protest that the officers had killed Dorner and would kill her. Plaintiff said she did not want to go to jail and had broken no law. Burton said the problem was that Plaintiff was not calming down and that Sprecher would not be driving her home.

4. Capitals original in transcript.

Burton said, "If anyone's taking you home, it's us." Plaintiff cried repeatedly to Sprecher that the officers were taking her to jail. Burton warned several times that Plaintiff was on ice and that they did not want her to fall.

The deputies tried to get Plaintiff to enter the patrol car. Mariedth said, "Stop resisting." When Plaintiff claimed that Sprecher would take her home, Mariedth said, "We're way past that hun, so you might as well chill." Mariedth said having Sprecher take Plaintiff home "was not gonna happen." Plaintiff said, "Why? What law am I breaking." Mariedth said, "Uh, you're drunk in public." Plaintiff said, "I was in his house. I was in his house." Hollenbaugh said, "But he didn't want you in his house. That's the problem." Plaintiff resumed begging Sprecher to take her home. Mariedth said, "Not gonna do you any good Hun." Sprecher said, "You could have been at my house but you're making too much trouble."

Mariedth directed Plaintiff to get into the car. Plaintiff told Sprecher to come get her out of jail and said, "Wait." Burton twice told Plaintiff to get into the car. Mariedth said, "Stop resisting or you're gonna get another charge." Plaintiff said, "My pants are falling down first of all, please pull my pants up first, you Faggot, pull my Goddamn pants up." Burton apparently pulled Plaintiff's pants up. Sprecher said, "Barbara quit resisting, they're gonna hurt you." Plaintiff told Sprecher, "they'll kill me." Burton again told Plaintiff to step into the car. Plaintiff cried repeatedly to Sprecher that the officers would kill her. Hollenbaugh said, "Step into the car" and Mariedth said, "Stop it." Plaintiff entered the car and the door closed.

## 2. Hollenbaugh's Recording

Hollenbaugh's recording partially overlaps that of Burton. Hollenbaugh's recording begins later, when Hollenbaugh asked Plaintiff her name and Plaintiff loudly responded, "None of your damn business." The recording reflects that Plaintiff loudly repeated that her name was none of his "Goddamn business" and yelled, "Fuck you." Plaintiff said "Leave me alone, need a Goddamn ride home!" When Hollenbaugh asked Plaintiff how much she had to drink, Plaintiff responded, "None." Hollenbaugh said, "Are you sure about that?" and Plaintiff countered, "Fuck you!" Hollenbaugh said Plaintiff was not cooperating or giving her name, to which Plaintiff yelled, "I'm gonna tell you the whole Goddamn truth real soon bitch so SHUT UP!" When Hollenbaugh said, "Okay," Plaintiff said, "Fucking shut up" and "Fucking shut up motherfucker." Plaintiff whispered to Hollenbaugh, "Goddamn fucker I hate you; I hate you Bitch, I'll kill you." Plaintiff responded to Hollenbaugh's questions by yelling "FUCK YOU!" and "Okay, shut up then Bitch!" Plaintiff continually demanded that Sprecher give her a ride home and said that the deputies had guns and tasers and would kill her. The deputies asked her to calm down and said that they were not there to hurt her and that they just wanted to find out who she was. Burton said he had handcuffed Plaintiff because she was not cooperating.

Plaintiff repeatedly accused the deputies of killing Christopher Dorner and said she had broken no laws. The deputies both said they could not leave Plaintiff at her home in her condition and Burton asked Sprecher to talk some sense into Plaintiff. Plaintiff responded that the deputies had killed Dorner and repeatedly said the deputies would kill her. Burton asked whether Plaintiff was "okay in the head" or suicidal, but, instead of responding to the questions, Plaintiff kept repeating that the deputies would kill her.

When Sergeant Mariedth arrived, Hollenbaugh said Plaintiff was intoxicated or

"fifty one forty nine point five." [5] Plaintiff said she had just broken up with her boyfriend and had come to talk things out with him but he did not want her any more. Plaintiff told Sprecher she would not bother him any more and asked him to take her home. As the group began to walk down from the house, Sprecher said he probably could take her home. Plaintiff said the officers had killed Dorner and were going to kill her. Burton told Plaintiff to watch her step and said they were trying to calm her down. Plaintiff repeatedly yelled that she had broken no law and wanted Sprecher to take her home. As the officers guided Plaintiff over icy patches, Plaintiff wailed repeatedly for Sprecher to take her home. Plaintiff asked what law she had broken. Mariedth responded, "Uh, you're drunk in public." Plaintiff said she had been in Sprecher's house. Hollenbaugh responded, "But he didn't want you in his house. That's the problem." Sprecher said, "You could have been at my house but you're making too much trouble."

Burton told Plaintiff to step into the car. Mariedth told Plaintiff to stop resisting "or you're gonna get another charge." Plaintiff said, "My pants are falling down first of all, please pull my pants up first, you Faggot, pull my Goddamn pants up." Burton apparently pulled Plaintiff's pants up. Sprecher said, "Stop resisting or they're gonna hurt you." Plaintiff said, "They're gonna kill me." Burton and Hollenbaugh both told Plaintiff to step into the car.

#### D. Declaration of Travis Wijnhamer

In his Declaration, Defendant Wijnhamer states:

On February 16, 2013, at approximately 9:45 p.m., Wijnhamer responded to a 911 call reporting a domestic disturbance at a residence in Sugarloaf, California. By the time Wijnhamer arrived, deputies Burton and Hollenbaugh had handled the call and Plaintiff was already under arrest. Wijnhamer soon received another call and left the location. He was not involved in Plaintiff's arrest or the transportation of Plaintiff to jail.

Wijnhamer had no further contact with Plaintiff regarding the incident(s) and did not transport Plaintiff to ARMC for a 5150 evaluation or any other purpose.

#### E. Declaration of Gennifer Livingston

In her Declaration, San Bernardino County Deputy Sheriff Gennifer Livingston states:

Livingston was on duty at the West Valley Detention center when, close to midnight, Defendant Burton brought Plaintiff for booking on a charge of violating California Penal Code section 148(a)(1). Jail staff initially were unable to book Plaintiff because she was uncooperative and belligerent. Plaintiff cursed and screamed at the staff and physically refused to cooperate with booking. She appeared out of control and unable to calm down, and displayed symptoms of disorganized thoughts and delusional behavior. She screamed things such as "kill them" and "Dorner kill them all." Due to her combative behavior, Plaintiff was placed in a "speciality cell" shortly after midnight. The cell had large windows through which jail personnel could continuously observe Plaintiff.

5. California Welfare and Institutions Code section 5150.05 governs the determination of probable cause to take a person into custody pursuant to section 5150. However, Hollenbaugh's reference to "5149.5" may have been intended to communicate to Mariedth that Plaintiff was on the brink of being taken into custody pursuant to section 5150.

In the speciality cell, Plaintiff screamed and banged on the windows, but refused or was unable to control herself. This went on for half an hour, as Plaintiff's blows to the windows became increasingly more violent. Plaintiff appeared to be under the influence of a controlled substance and unable to calm down on her own.

Jail staff contacted the nurse on duty for assistance. At approximately 1 a.m., the nurse ordered Plaintiff to be placed in a restraint chair to prevent Plaintiff from injuring herself. Plaintiff continued to scream and yell "kill them."

Jail staff contacted the medical professional on duty at ARMC and described Plaintiff's behavior. The medical professional, a physician's assistant, ordered a "calming medication" to be given to Plaintiff by injection. The nurse on duty administered the injection. Despite the injection, Plaintiff continued screaming, cursing and yelling threats until approximately 3 a.m. Plaintiff was offered water, and jail staff exercised her limbs while she was in the chair.

Once Plaintiff calmed down, Plaintiff was removed from the chair and placed back in the speciality cell. Plaintiff refused liquids and refused the morning meal at 5:45 a.m. Plaintiff finally cooperated with the booking process at approximately 6:30 a.m. However, Plaintiff still did not appear rational. Plaintiff could not answer health questions, including whether she was taking any medications. Jail staff was concerned about Plaintiff's mental health due to her behavior during the night and her continued paranoid delusions in the morning. Jail staff members noted from prior bookings that Plaintiff had a history of mental health issues and were concerned that Plaintiff would be unable to care for herself if released from custody. Staff members believed it necessary to ask a medical and psychiatric professional to evaluate Plaintiff. Livingston completed an application for a 72–hour detention for evaluation and treatment pursuant to California Welfare and Institutions Code section 5150. Staff then contacted the jail transportation unit to take Plaintiff to ARMC for the evaluation. After the transportation deputy escorted Plaintiff from the jail, Livingston had no further contact with Plaintiff.

Livingston does not remember herself or anyone else at the jail removing Plaintiff's clothing. The only time clothing is removed from an inmate is when the inmate displays suicidal behavior or there is a suicide concern. In such cases, jail staff remove the inmate's clothing and provide the inmate with a privacy gown. Livingston has never seen or allowed any inmate to sit naked or be left naked, and did not do so in this case.

### F. Deposition of Dr. Mailan Pham

Dr. Malian Pham testified at deposition as follows:

Dr. Pham reviewed the February 17, 2013 section 5150 application concerning Plaintiff. After conducting an independent evaluation of Plaintiff, Pham and ARMC staff made the determination to put Plaintiff on the section 5150 hold. Pham assessed Plaintiff as manic, paranoid, hyper-religious, disorganized, easily agitated and illogical, with "rapid pressured speech." Plaintiff was suffering from bi-polar disorder manifesting as psychosis. Pham attempted to prescribe an antipsychotic medication for Plaintiff. On February 20 Plaintiff refused Risperdal, an antipsychotic medication.

If, at the end of a 72–hour hold, a patient has not made progress, the patient is placed on a 14–day hold. Plaintiff was placed on an extended hold and left the hospital on February 21.

## II. Plaintiff's Evidence

Plaintiff relies on her unverified Opposition, a declaration attached to the Opposition, Plaintiff's unverified Corrected Opposition, unsworn statements made in responses to Defendants' Separate Statement of Undisputed Material Facts and Contentions of Law, Plaintiff's "Corrected/Amended Declaration attached to her "Submission of Evidence," and exhibits. Despite the fact that some of Plaintiff's statements are unsworn, the Court will consider the statements to the extent Plaintiff has shown that the matter contained therein could be presented in an admissible form at trial. See Southern California Darts Ass'n v. Zaffina, 762 F.3d 921, 925–26 (9th Cir. 2014); Fraser v. Goodale, 342 F.3d 1032, 1036–37 (9th Cir. 2003), cert. denied, 541 U.S. 937, 124 S.Ct. 1663, 158 L.Ed.2d 358 (2004).

### A. Plaintiff's Statements
### 1. Plaintiff's Unsworn Opposition

Plaintiff's unsworn Opposition is confused and conclusory. Plaintiff states that she will prove that Defendants' actions purportedly were "illegal, malicious, immoral, unjust and possible sexual offenses during the drugging of Plaintiff at West Valley Detention Center...." (Opposition, p. 2). Plaintiff appears to allege she was the victim of mental taunts, torture, "possibly sexual abuse" and a "hate crime" based on her gender and race (id., pp. 2–3). The Third Amended Complaint contains no allegations that Plaintiff was subjected to any form of sexual abuse during the Sugarloaf incident or during Plaintiff's stay at the West Valley Detention Center, or that Plaintiff was the victim of any taunts, torture, gender discrimination or race discrimination. "A party may not circumvent [Federal Rule of Civil Procedure] Rule 8's pleading requirements by asserting a new allegation in response to a motion for summary judgment." Ward v. Clark County,

285 Fed.Appx. 412, 413 (9th Cir. 2008) (district court did not err by granting summary judgment on claim which plaintiff did not allege in her pleading but only in her opposition to summary judgment). Hence, the Court will disregard these unpleaded allegations.

### 2. Plaintiff's Declaration Attached to Her Opposition

In a one-page Declaration attached to her Opposition, Plaintiff states that, on February 16, 2013, Plaintiff allegedly was invited to Sprecher's home to talk things over regarding Roger's [sic] attempt to sever his asserted relationship with Plaintiff. Plaintiff alleges that, two days before, Roger assertedly had come to Plaintiff's home, abused Plaintiff verbally and threatened Plaintiff's life. Roger allegedly told Plaintiff he wanted her back. The discussion on February 16 allegedly escalated into shouting and pushing, and Sprecher called 911, assertedly fearing that Plaintiff and Roger would kill each other.

Plaintiff alleges that Defendants arrived and "immediately" arrested Plaintiff. Plaintiff allegedly feared for her life due to injuries she purportedly suffered in an alleged encounter with California Highway Patrol officers and Big Bear sheriffs on November 30, 2011. Plaintiff mentions that the 2011 incident supposedly included a "blood letting," a breathalyzer test, Plaintiff's first lawsuit against law enforcement and the killing of Christopher Dorner. Plaintiff contends she was "innocent." (These allegations are not directly material to any issue presented here).

In notations made to a partial copy of Defendants' Separate Statement of Undisputed Material Facts and Conclusions of Law, Plaintiff states that the deputies purportedly concluded that Plaintiff was "mentally ill, 'like all Blacks'" (Opposition, p. 8). Plaintiff denies that she was fighting with Sprecher when the deputies arrived,

denies screaming, and says she was crying for fear of her life. The audio recordings belie Plaintiff's statements that she was not arguing with Sprecher when the deputies arrived, as well as her statements that she was not screaming during the incident.

### 3. Plaintiff's Corrected Opposition

In her unsworn Corrected Opposition, Plaintiff contends she has experienced a recovered memory of alleged sexual abuse at the West Valley Detention Center (Corrected Opposition, p. 2). Plaintiff contends she now can recall the face and attire of a man whom Plaintiff supposedly could identify at a lineup (id.). Purportedly, Plaintiff now realizes that this man wore a green jacket, such as that worn by jail staff or deputies, and asserts that she was left alone in a cell with the man while Plaintiff allegedly was naked, sedated by two injections, passed out and strapped in the "restraint chair" (id., pp. 2–3). Plaintiff allegedly does not recall what happened, but speculates that sexual abuse occurred (id., p. 3).[6] Plaintiff states an intent to report the alleged incident to the FBI (id., pp. 3–4). Plaintiff mentions an alleged wrongful death lawsuit against Defendant Wijnhamer and describes her supposed depression and fear of Big Bear sheriff's deputies (id., p. 4). Plaintiff accuses Defendants of attempting to discredit Plaintiff and justify her commitment to a mental ward every time "Big Bear Law Enforcement" encounters Plaintiff, supposedly by deeming Plaintiff to be crazy, paranoid, delusional, "stark raving mad" and/or drunk (id.).

Plaintiff alleges that Defendants did not follow proper procedures concerning the arrest and detention of persons appearing to suffer from "acute medical conditions, which includes Plaintiff ..." (id.). Plaintiff apparently asserts Defendants should have taken Plaintiff to a hospital rather than to jail (id., pp. 4–5).

In an unsworn attachment, Plaintiff purports to respond to Defendants' Statement of Undisputed Material Facts and Contentions of Law with commentary and occasional references to anticipated, and undescribed, future testimony. Plaintiff references alleged audio and video recordings and documents which are not in evidence, including an alleged 911 call recording, Wijnhamer's alleged audio recording, Mariedth's alleged audio recording and undescribed texts, tweets, emails, videos and "lists."[7] Plaintiff does not describe the contents of this alleged evidence or show its materiality to the issues presented here. Plaintiff refers to other alleged matters such as sex abuse, other lawsuit(s), a purported FBI investigation and race and religious discrimination, all of which are not at issue in this case.

Plaintiff additionally contends she was never asked to leave Sprecher's residence but was a "welcomed guest." She claims she could not "impede" anything while in handcuffs and under arrest. Plaintiff asserts that Burton "yanked" Plaintiff outside, where it was 10 degrees. She also states that she is "disabled."

### 4. Plaintiff's Declaration Attached to Her "Submission of Evidence"

Plaintiff's Declaration attached to her "Submission of Evidence, etc." appears to

---

**6.** These new allegations of purported sexual abuse are not directly material to the issues presented here.

**7.** Plaintiff alleges she was "too afraid to do discovery" (see Corrected Opposition, p. 23). To the extent this allegation might be construed as a request for leave to conduct belated discovery pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, Plaintiff has failed to meet her burden under that Rule "to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." See Chance v. Pac–Tel Teletrac Inc., 242 F.3d 1151, 1161 n.6 (9th Cir. 2001) (citation omitted).

concern events other than the incident at issue here. Plaintiff complains that officers assertedly have pulled her son over repeatedly and that deputies allegedly towed Plaintiff's car ("Corrected/Amended Declaration, etc.," attached to "Submission of Evidence," p. 1). Plaintiff references two supposed car crashes, alleged retaliation, the alleged loss of her driver's license, Plaintiff's alleged heritage and living situation and Plaintiff's alleged general dissatisfaction with Sugarloaf (id., pp. 2–3). Plaintiff alleges that she was "wrongfully arrested because Plaintiff lives alone" (id., p. 3). Plaintiff asserts that she was "not homicidal" and "not a threat to anyone" on the night of the incident (id., p. 4). Plaintiff contends that she supposedly was trying to reconnect with Sprecher and to avoid getting beaten up by Sprecher's roommate and Plaintiff's ex-boyfriend Roger (id.). Plaintiff contends the Defendants never did any investigation, but intended simply to arrest Plaintiff (id.).

According to Plaintiff, Defendant Wijnhamer was dispatched and arrived first at the scene, followed by Defendant Hollenbaugh and then Defendant Burton (id.). Plaintiff contends Wijnhamer left after her arrest. Plaintiff contends Burton showed up because he heard Plaintiff's name over the dispatch radio. Burton allegedly showed animosity and hatred for Plaintiff.

Plaintiff challenges Defendant Wijnhamer's statement that he was not involved in Plaintiffs' arrest, citing dispatch records. Plaintiff contends that Wijnhamer did not follow proper procedures or "stop the injustice & malicious acts of his co-workers" (p. 5). Plaintiff contends she told Wijnhamer that no crime had been committed, that everything was "good" between Plaintiff and Sprecher and that the "perpetrator," "Roger Tierce," had already left (id.). Plaintiff contends none of the Defendants conducted an investigation, "they only wanted me, my name, my cooperation and

for me to not object to sexual abuse or deputies pulling plaintiff's pants down during arrest" (id., pp. 5–6). Plaintiff also speculates that Hollenbaugh may have pulled Plaintiff's pants down or raped Plaintiff (id., p. 6).

## B. Plaintiff's Documentary Evidence

Plaintiff attaches to her Corrected Opposition various documents which appear to be immaterial to the issues in this case, including documents purporting to be Plaintiff's birth certificate, driver's license, a tort claim concerning a different incident, documents concerning an automobile insurance policy, documents filed in different lawsuits concerning a different incident or incidents, an application for social services, and purported medical records, the relevance of which is unclear and unexplained. Some of the records appear to concern Plaintiff's mental health issues both before and after the incident at issue here. However, Plaintiff also submits a police report allegedly authored by Defendant Burton (see Corrected Opposition, Ex. 20) which is consistent with Burton's declaration and Burton's belt recording, both described above.

Plaintiff also attaches to her Corrected Opposition an alleged dispatch log which shows that a domestic disturbance dispatch assertedly went out at 21:44:34 on February 16, 2013 (Corrected Opposition, Ex. 16). According to the log, a male caller who was "out of breathing" reported the disturbance and advised that "he was trying not to get involved." The dispatch gives a phone number and the name "Johnathan," and states: "RP'S GF AND FEM SUBJ EX BF AT LOC 415V SUBJS ARE HBD." A "CLARFY" dispatch then states: "RP ADVS HE IS TRYING TO GET SUBJS TO LEAVE LOC...." The dispatch identifies a "SUBJ" as Plaintiff.

The log records alleged "COMBAT-IVE/HOBBLING." At 23:07:57 Burton ("E4540/M764") allegedly reported: "BROWN STARTED TO KICK WINDOW OUT OF UNIT WHEN I STARTED TO LEAVE BIG BEAR JAIL TO WVDC. BROWN WAS HOBLED [sic] AND SEAT BELTED INTO THE BACK OF THE UNIT." A "CLEAR" entry at 01:54:34 reads:

> BROWN REFUSED TO OBEY COMMANDS AT THE SCENE AND NEEDED TO BE PLACED IN A REAR WRIST LOCK TO REMOVER [sic] HER FROM HER BOYFRIENDS, JONATHAN, HOME. WHEN DEPUTIES ASKED BROWN WHAT HER NAME WAS SHE REFUSED TO GIVE HER NAME MULT TIMES AND SAID FUCK YOU. DO [sic] TO BROWN BEING A PRIOR UB SHE COULDN'T BE BOOKED INTO BB JAIL AND WAS TAKEN TO WVDC. BROWN TRIED TO KICK OUT THE WINDOW IN THE UNIT SO SHE WAS HOBLED [sic]. BROWN WAS COMBATIVE AND WVDC WAS ADVISED. BROWN REFUSED TO SIGN HER CITATION SO I COMPLETED A PC DEC FOR HER.

Plaintiff also has submitted an "Application for 72–Hour Detention for Evaluation and Treatment" (Corrected Opposition, Ex. 30). The Application, allegedly prepared by Deputy Livingston and signed on February 17, 2013, states that during the booking process Plaintiff reportedly showed signs of multiple personality disorder, disorganized thoughts and delusional and disoriented behavior. The Application records that, while in a holding cell, Plaintiff allegedly screamed uncontrollably and talked to herself, and that she assertedly was verbally assaultive and physically combative with staff, allegedly yelling things like "Dorner kill them all." The Application indicates that there assertedly was probable cause to believe that, as a result of a mental disorder, Plaintiff was a danger to herself and/or others.

Plaintiff also has submitted a purported copy of a "Specialty Cell Log" which records that Plaintiff allegedly was placed in the cell at "103" on February 17, apparently by Deputy Livingston (Plaintiff's Ex. 26). The log states, "Privacy Gown Provided." The box next to the list of "Restraints" is checked. The Shift Supervisor and Health Services nurse allegedly approved the placement. The log states that, while in the cell, Plaintiff continuously hit the cell window violently, refusing commands to stop. The log states that the nurse placed Plaintiff in the restraint chair for Plaintiff's safety. The log reflects that, after Plaintiff was placed in the restraint chair, she yelled, screamed and refused water. At 2:24 a.m., Plaintiff reportedly received water and an exercising of her extremities. Several entries thereafter report that Plaintiff was still yelling and screaming. At 3:13 a.m., Plaintiff allegedly was taken out of the restraint chair and moved to a safety cell. At 7:11 a.m., Plaintiff reportedly was transferred to ARMC on a "5150 hold."

## C. Limitations on Consideration of Plaintiff's Evidence

In determining whether Plaintiff's evidence raises a genuine issue of material fact, the Court will not consider unsupported allegations in Plaintiff's unverified Third Amended Complaint. See Assoc. Gen. Contractors of America, San Diego Chapter, Inc. v. Calif. Dep't of Transp., 713 F.3d 1187, 1195 (9th Cir. 2013) ("An unverified complaint cannot form the basis of evidence considered at summary judgment.") (citation omitted). Nor will the Court consider conclusory statements or speculation that some future testimony or other hypothetical evidence not in the rec-

ord[8] might conceivably raise a genuine issue of material fact. See Aerotec Internat'l, Inc. v. Honeywell Internat'l, Inc., 836 F.3d 1171, 1175 (9th Cir. 2016) ("anecdotal speculation and supposition are not a substitute for evidence" on summary judgment); Loomis v. Cornish, 836 F.3d 991, 997 (9th Cir. 2016) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment") (citation and internal quotations omitted); Columbia Pictures Industries, Inc. v. Fung, 710 F.3d 1020, 1043 (9th Cir.), cert. denied, —— U.S. ——, 134 S.Ct. 624, 187 L.Ed.2d 398 (2013) ("conclusory allegations, standing alone, are insufficient to prevent summary judgment") (citation, internal quotations and footnote omitted).

As indicated above, the Court also declines to consider claims Plaintiff did not plead in the Third Amended Complaint. See Ward v. Clark County, 285 Fed.Appx. 412, 413 (9th Cir. 2008). The Court also will not consider evidence concerning irrelevant matters. See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001) ("Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment.") (citation omitted).

The Court will consider Plaintiff's various statements submitted in opposition to the Motion for Summary Judgment to the extent Plaintiff states "facts that would be admissible evidence" rather than "only conclusions." See Manley v. Rowley, 847 F.3d 705, 710–11 (9th Cir. 2017) (citation omitted).

■ However, the audio recordings of the Sugarloaf incident clearly refute by blatant contradiction many of Plaintiff's assertions; such as her assertion that she was not screaming during the incident. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("Scott") (on summary judgment, improper to credit party's version of events which was "so utterly discredited by the record [a police cruiser video recording] that no reasonable jury could have believed him"); see also United States v. Various Slot Machines on Guam, 658 F.2d 697, 701 (9th Cir. 1981) ("Even on a motion for summary judgment, a court is not compelled to give weight to an allegation that is uncontrovertedly demonstrated to be false."). Hence, the Court disregards those portions of Plaintiff's evidence which are "blatantly contradicted" by the audio recordings. See Gaddy v. Sherman, 588 Fed.Appx. 564 (9th Cir. 2014) (affirming summary judgment for defendants on prisoner's excessive force claim where video recording showed prisoner did not comply with prison officials' orders to exit his cell and submit to restraints); Pierson v. Bassett, 534 Fed.Appx. 768, 771 (10th Cir. 2013) (applying Scott where audiotapes showed plaintiff was argumentative with police, in spite of his allegations that he was compliant); Nails v. Haid, 2016 WL 4180973, at *7–9 (C.D. Cal. Apr. 6, 2016) (on summary judgment, audio recordings, medical records and booking photographs "blatantly contradicted" the plaintiff's version of events, rendering the plaintiff's version "so utterly discredited by the record that no reasonable jury could believe him")

---

8. For example, as indicated above, Plaintiff alludes to alleged audio recordings of Defendant Wijnhamer and Sergeant Mariedth, alleged emails, text messages, notes, declarations, an alleged 911 call recording and alleged audio and video recordings of the West Valley Detention Center. None of these items are in the record.

(citation, internal quotations and ellipses and footnote omitted).

## DISCUSSION

### I. The Detention and Arrest of Plaintiff Were Lawful.

#### A. The Detention

The Fourth Amendment permits brief investigative stops ... when a law enforcement officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." [citations]. The "reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability." [citation]. The standard takes into account "the totality of the circumstances—the whole picture." [citation]. Although a mere " 'hunch' " does not create reasonable suspicion, [citation], the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause. [citation].

Navarette v. California, — U.S. ——, 134 S.Ct. 1683, 1687, 188 L.Ed.2d 680 (2014); see Terry v. Ohio, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In the present case, the undisputed facts show that the initial detention of Plaintiff was lawful. At the time Deputies Burton and Hollenbaugh arrived at the residence, the deputies knew that the resident (Sprecher) had reported a domestic disturbance involving his girlfriend and an ex-boyfriend. Sprecher was out of breath and said he wanted to stay "out of it." Sprecher said the female and male had been drinking. Upon arrival at Sprecher's residence, through an open door, the deputies saw Plaintiff standing over Sprecher yelling. Indeed, in the Declaration attached to her Opposition, Plaintiff states that the incident at Sprecher's residence had escalated into shouting and pushing, and that Sprecher had called 911 because he assertedly feared that Plaintiff and Roger would kill each other. Sprecher said he had asked Plaintiff to leave, and he wished Plaintiff would have left. The deputies reasonably could have suspected that Plaintiff was involved in a domestic assault [9] or that, at a minimum, Plaintiff's refusal to leave the residence had constituted a trespass.[10] The deputies had reasonable suspicion to detain Plaintiff and to investigate the situation. See Navarette v. California, 134 S.Ct. at 1688–90 (911 call provided reasonable suspicion for detention, where caller had eyewitness knowledge of the event, the report was contemporaneous with reported event, and caller used the 911 system, which provides safeguards against false reports); see also Muehler v. Mena, 544 U.S. 93, 101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005) ("[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual ... and ask to examine the individual's identification ...") (citation and internal quotations omitted).

The subsequent handcuffing of Plaintiff did not convert the detention into an arrest. "The totality of the circumstances determines whether and when an investigatory stop becomes an arrest." United States v. Edwards, 761 F.3d 977, 981 (9th Cir. 2014) (citation omitted).

In looking at the totality of the circumstances, we examine two main com-

---

9. See Cal. Penal Code § 240 ("An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.").

10. See Cal. Penal Code § 602(o) (discussed below).

ponents of the detention, [citation]. First is "the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted." Id. Under this component, we "review the situation from the perspective of the person seized," assessing whether "a reasonable innocent person in these circumstances would ... have felt free to leave after brief questioning." [citation]. Second is "the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." [citation]. This "inquiry is undertaken ... from the perspective of law enforcement," while bearing in mind that "the purpose of a Terry stop is to allow the officer to pursue his investigation without fear of violence." [citation]. "The second inquiry frequently proves determinative." [citation].

Id.

The audio recordings do not indicate precisely when Burton handcuffed Plaintiff. However, the declarations of Defendants indicate that Burton handcuffed Plaintiff after: (1) Plaintiff refused Burton's order to come outside so that Burton could get her story separately and Plaintiff said "I'm not going to jail. Fuck you."; (2) Plaintiff again refused an order to come outside to talk to Hollenbaugh, used profanity and said "I'm not going nowhere."; (3) Plaintiff thus impeded the deputies' ability to interview Sprecher outside of Plaintiff's presence; (4) Plaintiff refused to give Burton her name; (5) Plaintiff refused several orders to put her cigarette out and was waving the cigarette around in such a way as to cause the deputies to fear that Plaintiff would harm herself or the deputies; (6) Plaintiff made paranoid statements concerning Christopher Dorner and said the deputies would kill Plaintiff; (7) despite efforts by Sprecher and the deputies to calm Plaintiff down, Plaintiff became increasingly agitated; (8) when Burton put his hand on Plaintiff's shoulder to direct her out of the residence, Plaintiff pulled away; and (9) Plaintiff refused to heed the requests of the deputies and Sprecher to stop screaming and to calm down. Burton then handcuffed Plaintiff and removed her from Sprecher's residence to sit on a retaining wall outside the door. There is no evidence that the handcuffing was done in rough manner or that the handcuffs were overly tight or unduly uncomfortable.[11] Plaintiff has not presented any factual evidence to dispute the foregoing version of events, except to contend that she was not screaming. This contention must be rejected as "blatantly contradicted" by the audio recordings. Plaintiff screamed loudly and repeatedly.

The handcuffing of Plaintiff was minimally intrusive under the circumstances. Plaintiff was screaming, flailing her arms, disobeying the deputies' orders and acting out of control, giving the deputies reason to fear for Plaintiff's safety and their own. The officers repeatedly told Plaintiff that

11. To the extent Plaintiff claims in conclusory fashion that the deputies subjected her to excessive force in compelling Plaintiff to leave the residence and in handcuffing Plaintiff, the undisputed material evidence shows Plaintiff was screaming, cursing, resisting the deputies' orders to exit the residence and flailing a lighted cigarette around. The deputies acted reasonably in placing a hand on Plaintiff's shoulder to direct her outside and in handcuffing Plaintiff while they proceeded with their investigation. The evidence, including the audio recordings, does not include any contemporaneous complaint by Plaintiff regarding any physical touching or handcuffing. See MacLellan v. County of Alameda, 2014 WL 793444, at *5 (N.D. Cal. Feb. 26, 2014) (handcuffing did not amount to excessive force where injuries were minor and plaintiff did not complain about allegedly tight handcuffs at any time during the relevant period).

they only wanted her to calm down so that they could perform their investigation and that they were not arresting her. In these circumstances, the handcuffing of Plaintiff did not transform the investigatory detention into an arrest. See Haynie v. County of Los Angeles, 339 F.3d 1071, 1077 (9th Cir. 2003) (where suspect became belligerent, yelled and refused to obey orders to spread feet during pat-down search and to sit down thereafter, handcuffing and placement of suspect in patrol car for approximately 16–20 minutes did not transform detention into an arrest); United States v. Taylor, 716 F.2d 701, 709 (9th Cir. 1983) ("the use of handcuffs, if reasonably necessary, while substantially aggravating the intrusiveness of an investigatory stop, do[es] not necessarily convert a Terry stop into an arrest necessitating probable cause.").

In sum, as a matter of law, the detention of Plaintiff was supported by reasonable suspicion, and the handcuffing did not transform the detention into an arrest.[12] Defendants are entitled to summary judgment on any challenge to the lawfulness of the detention.

## B. The Arrest

▉ Under the Fourth Amendment, an arrest is constitutionally reasonable "when an officer has probable cause to believe a person committed even a minor crime in his presence...." Virginia v. Moore, 553 U.S. 164, 171, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008) (officers did not violate Fourth Amendment by arresting motorist whom they believed was driving with a suspended license, although under state law officers should have issued a summons rather than make an arrest); see also Atwater v, City of Lago Vista, 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (Fourth Amendment does not forbid warrantless

arrest for "even a very minor criminal offense" committed in arresting officer's presence, such seatbelt violation).

▉ An officer has probable cause to make a warrantless arrest when the facts and circumstances within his or her knowledge are sufficient for a reasonably prudent person to believe that the suspect has committed a crime. See Rosenbaum v. Washoe County, 663 F.3d 1071, 1076 (9th Cir. 2011). In determining whether there was probable cause to arrest, an arresting officer's subjective conclusions are irrelevant. See Devenpeck v. Alford, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004); Whren v. United States, 517 U.S. 806, 812–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "Because the probable cause standard is objective, probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest." Edgerly v. City and County of San Francisco, 599 F.3d 946, 954 (9th Cir. 2010) (citation omitted); see Devenpeck v. Alford, 543 U.S. at 153–56, 125 S.Ct. 588.

As discussed in more detail below, as a matter of law, probable cause existed to arrest Plaintiff for: (1) trespass in violation of California Penal Code section 602(o); and (2) resisting, delaying or obstructing an officer in violation of California Penal Code section 148(a). Probable cause also existed to detain Plaintiff pursuant to California Welfare and Institutions Code section 5150.

### 1. Trespass

▉ Probable cause existed to arrest Plaintiff for trespass. California Penal Code section 602(o) makes it unlawful to refuse or fail to leave property lawfully occupied by another and not open to the general public, upon the request of: (1) a

---

12. Moreover, even if the handcuffing did transform the detention into an arrest, the

deputies then had probable cause for the arrest. See Discussion section IB, infra.

peace officer acting at the request of the owner, the owner's agent or the person in lawful possession, and upon being informed by the peace officer that he or she is acting at the request of the owner, the owner's agent or the person in lawful possession; or (2) the owner, the owner's agent or the person in lawful possession. The officers had probable cause to believe that Sprecher was in lawful possession of his residence, that he had asked Plaintiff to leave and that Plaintiff had not left. The dispatch log bears an entry indicating that the reporting party ("RP") stated that his girlfriend and her ex-boyfriend were involved in a disturbance and that the reporting party was "TRYING TO GET SUBJS TO LEAVE LOC." Burton stated in his declaration that Sprecher said he had asked Plaintiff to leave and wished she had left sooner. Sprecher's voice on an early portion of Burton's audio recording confirms that Sprecher had asked Plaintiff to leave and Plaintiff instead had remained. Accordingly, the officers had probable cause to arrest Plaintiff for trespass.

## 2. Resisting, Delaying or Obstructing an Officer

■ Under California Penal Code section 148(a)(1), "[e]very person who willfully resists, delays, or obstructs any ... peace officer ... in the discharge or attempt to discharge any duty of his or her office or employment" is subject to a fine, imprisonment or both. While section 148(a)(1) is "often referred to as a statute prohibiting 'resisting arrest' ... the statutory prohibition is much broader than merely resisting arrest." Hooper v. Cty. of San Diego, 629 F.3d 1127, 1130 (9th Cir. 2011). "The legal elements of [the] crime are as follows: (1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the

officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." Yount v. City of Sacramento, 43 Cal.4th 885, 894–95, 76 Cal.Rptr.3d 787, 183 P.3d 471 (2008), cert. denied, 555 U.S. 1099, 129 S.Ct. 905, 173 L.Ed.2d 109 (2009) (citation and internal quotations omitted).

■ The deputies' orders to Plaintiff to exit the residence, to provide her name, to put out her cigarette, and to calm down so they could investigate were lawful orders issued in aid of investigating an alleged domestic disturbance and possible trespass. See Smith v. City of Hemet, 394 F.3d 689, 697 (9th Cir. 2005) (en banc) (where officers were investigating 911 call alleging domestic abuse, plaintiff's refusals to obey officers' orders to take his hands out of his pockets, to put his hands on his head and come off the porch and turn around each "constituted a violation of § 148(a)(1)) sufficient to warrant the filing of a criminal charge" and "[e]ach could support a conviction under that section for obstructing the criminal investigation") (citations omitted).

As previously indicated, Plaintiff disputes some of the deputies' descriptions of Plaintiff's behavior, asserting that Plaintiff purportedly was not screaming during the incident and that she purportedly was a "welcomed guest" at Sprecher's residence. The dispatch log submitted by Plaintiff and the audiotapes blatantly contradict Plaintiff's assertions. The undisputed material evidence shows that Sprecher had stated that he wanted Plaintiff out of his residence [13] and that Plaintiff was screaming and cursing at Sprecher and at the deputies. Because Plaintiff's (unsworn)

---

13. At some time prior to the 911 call, Plaintiff may well have been a "welcomed guest" at Sprecher's residence. However, at the time of Plaintiff's arrest, the deputies plainly had probable cause to believe that Plaintiff had remained there after she was no longer welcome.

version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it," the Court will not assume the truth of Plaintiff's contradictory version for the purposes of ruling on the Motion for Summary Judgment. See Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

The record also blatantly contradicts any assertion by Plaintiff that she simply was verbally challenging the deputies rather than resisting, delaying or evading them in the performance of their duties. "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." City of Houston, Tex. v. Hill, 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). In the context of section 148(a), "the fact that someone verbally challenges a police officer's authority or is slow to comply with orders does not mean that he or she has delayed an investigation." In re Chase C., 243 Cal.App.4th 107, 117, 196 Cal.Rptr.3d 381 (2015) (citation omitted); see In re Quiroga, 16 Cal.App.4th 961, 966, 20 Cal. Rptr.2d 446 (1993) (minor who initially was uncooperative but eventually obeyed officer's orders did not violate section 148(a)). "An individual's temporary refusal to comply with an officer's commands is not in itself a valid basis for an arrest." Sialoi v. City of San Diego, 823 F.3d 1223, 1234 (9th Cir. 2016) (citation omitted). "Nor is an individual's peaceful, verbal challenge to police action a valid basis." Id. (citation omitted).

"However, when a person's words go beyond verbal criticism, into the realm of interference with an officer's performance of his or her duty, the First Amendment does not preclude criminal punishment." In re Chase C., 243 Cal.App.4th at 117, 196 Cal.Rptr.3d 381 (citation, internal quotations and brackets omitted); see In re Muhammed C., 95 Cal.App.4th 1325, 1329–30, 116 Cal.Rptr.2d 21 (2002) (minor

who approached patrol car containing minor's arrested associate and spoke to associate, disobeyed officers' orders to stop and to move away from car, and raised his hand to officers, violated section 148(a), where minor did more than simply fail to respond, but rather "affirmatively responded to the police orders with defiance"); In re Joe R., 12 Cal.App.3d 80, 83–84, 90 Cal.Rptr. 530 (1970), disapproved on other grounds, In re Robert G., 31 Cal.3d 437, 182 Cal.Rptr. 644, 644 P.2d 837 (1982) (minor who interrupted officer talking with other minors, making it impossible for officer to conduct investigation, and also pushed officer, broke away when officer took hold of minor's arm, hit another officer and used profane language violated section 148(a)); see also Young v. County of Los Angeles, 655 F.3d 1156, 1170 (9th Cir. 2011) (motorist's disobedience of officer's order to reenter car following traffic stop was not an act of speech protected by the First Amendment but rather an act of disobedience justifying arrest for violation of section 148(a)). Plaintiff's conduct was not limited to verbal complaints or a temporary refusal to obey orders or to give identifying information. Rather, the facts indisputably show that Plaintiff: (1) refused multiple orders to leave the residence so that the deputies could conduct an investigation by talking with Sprecher and Plaintiff separately; (2) waved a lighted cigarette; (3) cursed and screamed at the deputies and accused them of wanting to kill her; (4) disregarded the deputies' commands to calm down and to provide her name and identification; (5) pulled away when Defendant Burton put his hand on Plaintiff's shoulder to guide her out of the residence; and (6) threatened to kill Defendant Hollenbaugh. The evidence shows as a matter of law that the deputies had probable cause to arrest Plaintiff for a violation of section 148(a). See In re J.C., 228 Cal.App.4th 1394, 1396–1400, 176 Cal. Rptr.3d 503 (2014) (upholding finding that

minor violated section 148(a), where minor: (a) threatened to punch school principal and another student; (b) became more irate and began yelling, screaming, using profanity and pacing; (c) disobeyed police officer's orders to sit down and calm down; and (d) pulled away and began to walk away after officer advised that minor was being detained and attempted to put control hold on minor); People v. Lopez, 119 Cal.App.4th 132, 135–36, 13 Cal.Rptr.3d 921 (2004), cert. denied, 543 U.S. 1158, 125 S.Ct. 1312, 161 L.Ed.2d 127 (2005) (defendant's refusal to identify himself, coupled with his "belligerent" conduct including attempts to avoid a pat-down by rolling away to kick officer, violated section 148).

### 3. Section 5150 Detention

■■■■■■ As indicated above, California Welfare and Institutions Code section 5150(a) authorizes a peace officer, among others, to take a person into custody for up to 72 hours for assessment and evaluation if, as a result of a mental health disorder, the person is "a danger to others, or to himself or herself, or gravely disabled." A detention pursuant to section 5150 must be supported by probable cause. Bias v. Moynihan, 508 F.3d 1212, 1220 (9th Cir. 2007); Maag v. Wessler, 960 F.2d 773, 775–76 (9th Cir. 1991); Cal. Welf. & Inst. Code §§ 5150(a), 5050.05. "Probable cause exists under section 5150 if facts are known to the officer that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself." Bias v. Moynihan, 508 F.3d at 1220; People v. Triplett, 144 Cal.App.3d 283, 287–88, 192 Cal.Rptr. 537 (1983).

[Under section 5150, a] peace officer (or other authorized person) ... is not required to make a medical diagnosis of mental disorder. It is sufficient if the officer, as a lay person, can articulate behavioral symptoms of mental disorder, either temporary or prolonged. An all-encompassing lay definition of mental disorder is difficult if not impossible to formulate. But, generally, mental disorder might be exhibited if a person's thought processes, as evidenced by words or actions or emotional affect, are bizarre or inappropriate for the circumstances.

People v. Triplett, 144 Cal.App.3d at 288, 192 Cal.Rptr. 537.

■■■■ Here, the undisputed material facts show that Plaintiff was screaming and wailing inappropriately, refusing to heed the exhortations of Sprecher and the deputies to calm down, resisting the deputies' orders, and demonstrating paranoia by yelling that the deputies intended to kill her. Plaintiff also threatened to kill Hollenbaugh. The audio recordings alone manifestly demonstrate that the deputies had probable cause to believe that Plaintiff was mentally disordered and a danger to herself and others.

In sum, as a matter of law, the deputies had probable cause to arrest Plaintiff for trespass, probable cause to arrest Plaintiff for resisting, delaying or obstructing an officer, and probable cause to detain Plaintiff pursuant to California Welfare and Institutions Code section 5150. Accordingly, Defendants are entitled to summary judgment on any challenge to the lawfulness of the arrest.[14]

---

14. In light of this determination, the Court need not, and does not, reach the issues of qualified immunity. The defense of qualified immunity protects government officials from liability for civil damages as long as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73

## II. Plaintiff Has Failed to Produce Evidence From Which a Reasonable Jury Could Conclude that Any of the Defendants Were Materially Involved in the Alleged Incidents at the West Valley Detention Center or the Hospital.

As indicated above, Defendant Burton states in his declaration that he took Plaintiff to the West Valley Detention Center and, after completing a probable cause declaration, left Plaintiff in the custody of jail deputies and nurses and had no further contact with Plaintiff. Defendant Hollenbaugh states that he did not escort Plaintiff to West Valley Detention Center or ARMC and was not present at WVDC when Plaintiff was taken there. Defendant Wijnhamer states that he was not involved in transporting Plaintiff to the jail, did not transport Plaintiff to ARMC, and had no further contact with Plaintiff.

 "An officer's liability under section 1983 is predicated on his 'integral participation' in the alleged violation." Blankenhorn v. City of Orange, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (citation omitted). "Integral participation" requires "some fundamental involvement in the conduct that allegedly caused the violation." Id. (citation omitted). Here, for the reasons discussed below, Defendants are entitled to summary judgment on Plaintiff's claims concerning her alleged treatment at the WVDC and her hospital detention, because Plaintiff has failed to produce evidence from which a reasonable jury could conclude that any of the Defendants was an integral participant in the alleged events at the WVDC or the hospital. See id. (officer who arrived on scene after arrest was completed and officer who provided crowd control not liable

for constitutional violations in connection with arrest); Hill v. City of Torrance, 2016 WL 3679298, at *6 (C.D. Cal. June 9, 2016), adopted, 2016 WL 3658675 (C.D. Cal. July 7, 2016) (granting summary judgment for police officers who were not present during arrest or use of excessive force)

### A. Defendant Burton

 Plaintiff has produced no evidence to show that Defendant Burton was an integral participant in the alleged events at the WVDC or the hospital. In her "Corrected/Amended Declaration," Plaintiff alleges generally that "Defendants" had no search warrant or probable cause to arrest and detain Plaintiff, to commit her to a mental ward, to rape, drug and almost kill Plaintiff, to tie her to a restraint chair naked and drugged all night long and to leave her there so that a man in a green sheriff's jacket could rape Plaintiff (Corrected/Amended Declaration, p. 6). Plaintiff's conclusory reference to "Defendants" is insufficient to show Burton's involvement in these alleged events. See Columbia Pictures Industries, Inc. v. Fung, 710 F.3d 1020, 1043 (9th Cir.), cert. denied, —— U.S. ——, 134 S.Ct. 624, 187 L.Ed.2d 398 (2013) (conclusory statements insufficient to defeat summary judgment).

Plaintiff asserts that she "now questions what really happened at the hands of unnamed perpetrator(s) while incarcerated at West Valley Detention Center on the night of February 16, 2013, which lead [sic] to Plaintiff filing this lawsuit...." (Corrected Opposition, p. 2). Plaintiff contends that, as a result of alleged "recent counseling," Plaintiff now recalls that she supposedly was left naked in a cell with a

L.Ed.2d 396 (1982). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct.

2151, 150 L.Ed.2d 272 (2001); see also John v. City of El Monte, 515 F.3d 936, 940 (9th Cir. 2008) (on summary judgment, because officer had probable cause to arrest plaintiff, "that ends the [qualified immunity] inquiry").

man in a green jacket (id.). Plaintiff's speculation that unnamed perpetrators, or some unidentified man in a green jacket, supposedly violated Plaintiff's rights does not satisfy Plaintiff's burden on summary judgment. See Aerotec Internat'l, Inc. v. Honeywell Internat'l, Inc., 836 F.3d 1171, 1175 (9th Cir. 2016); Loomis v. Cornish, 836 F.3d 991, 997 (9th Cir. 2016).

Plaintiff also asserts that, when Defendant Burton arrived with Plaintiff at the WVDC, a "Sergeant Youst" and "multiple deputies," one of which allegedly was Plaintiff's supposed rapist, purportedly were standing by "and the whole incident was recorded" (id., p. 8). No such recording has been submitted to the Court. Plaintiff's vague and confused allegations and references to nonexistent evidence do not suffice to withstand summary judgment. See Aerotec Internat'l, Inc. v. Honeywell Internat'l, Inc., 836 F.3d at 1175; Loomis v. Cornish, 836 F.3d at 997.

Plaintiff's responses to Defendants' Separate Statement of Undisputed Material Facts and Contentions of Law do not reference any material evidence showing any Defendant was involved in the alleged events at the WVDC or the decision to take Plaintiff to the ARMC. Defendants' Undisputed Material Fact No. 32 states: "Deputy Burton left Brown at West Valley in the custody of the jail deputies and nurses." Plaintiff purports to dispute this statement, and describes her purported supporting evidence as follows: "Plaintiff's Corrected declaration[,] Gennifer Livingston phone, email, texts, Duty Roster to name deputies and/or nurses on duty 2/16/13–2/17/13, so plaintiff can identify her rapist while in custody[.] A police line-up to identify (Plaintiff's) rapist." Defendants' Undisputed Material Fact No. 33 states: "After leaving her at West Valley, Burton had no further contact with Brown." Plaintiff contends this statement is "disputed," and describes her purported supporting evidence as follows: "Plaintiff's Corrected Declaration[,] Burton's audio Belt and audio/video dash cam, recordings and phone email texts for 2/16/13–2/17/13 Livingston audio, video, phone, email, texts for 2/16/13–2/17/13." (Corrected Opposition, p. 18).

Plaintiff's Corrected/Amended Declaration does not contain any statement controverting Burton's evidence that he left Plaintiff at WVDC in the custody of jail deputies and nurses and had no further contact with Plaintiff. Burton's belt recording contains no such controverting evidence. The record does not contain the supposed "dash cam" recording, other audio or video recordings, phone records, emails, texts or duty roster to which Plaintiff refers. Accordingly, Plaintiff has failed to produce evidence from which a reasonable jury could conclude that Defendant Burton had any "integral participation" in the alleged events at the WVDC or Plaintiff's hospital detention.

### B. Defendant Hollenbaugh

Plaintiff has failed to produce any material evidence to controvert Defendant Hollenbaugh's statement that he did not escort Plaintiff to West Valley Detention Center or ARMC and was not present at WVDC when Plaintiff was taken there. Defendants' Undisputed Material Fact No. 30, based on Hollenbaugh's declaration, states: "Deputy Hollenbaugh had no further involvement with Brown after she left the Big Bear jail with Deputy Burton to be taken to West Valley. Hollenbaugh did not escort Brown to West Valley or to Arrowhead Regional Medical Center for the 5150 evaluation." Plaintiff purports to dispute this statement and describes her purported supporting evidence as follows: "Plaintiff's Corrected Declaration, Burton's Audio & video recordings, Hollenbaugh's audio & video recordings, Burton,

Hollenbaugh, Wijnhamer, Sgt. Mariedth, Jonathan Sprecher's [sic] Gennifer Livingston & Marty Zemming phone contact list, emails, texts, notes, declarations spoken and written for 2/16/13–2/25/13 & 10/1/16–10/31/16" (Corrected Opposition, p. 7). Neither Plaintiff's Corrected Declaration nor the belt recordings of Defendants Burton and Hollenbaugh contain any evidence controverting Hollenbaugh's sworn statement that he had no involvement with Plaintiff after she left the Big Bear jail. The record does not contain the other alleged audio or video recordings, phone contacts lists, emails, texts, notes or declarations to which Plaintiff refers. Accordingly, Plaintiff has failed to produce evidence from which a reasonable jury could conclude that Defendant Hollenbaugh had any "integral participation" in the alleged events at the WVDC or Plaintiff's hospital detention.

### C. Defendant Wijnhamer

Plaintiff has failed to produce any material evidence to controvert Defendant Wijnhamer's statement that he was not involved in transporting Plaintiff to the jail or to ARMC, and had no further contact with Plaintiff regarding the incident after Wijnhamer left on another call. In her Corrected/Amended Declaration Plaintiff alleges in conclusory fashion that Wijnhamer violated Plaintiff's rights and adds that "Plaintiff suffered sexual abuse by a deputy sheriff, his co/workers or it was possibly him," apparently meaning Wijnhamer (Corrected/Amended Declaration, p. 5). Plaintiff's allegations of alleged sexual abuse are outside the scope of this action, and she has produced no evidence from which a reasonable jury could conclude that Wijnhamer had any "integral participation" in the events at the jail or the ARMC.

For the foregoing reasons, Defendants are entitled to summary judgment on Plaintiff's claims arising out of her confinement at the WVDC and the ARMC.

### RECOMMENDATION

For the reasons set forth above, IT IS RECOMMENDED that the Court issue an Order; (1) approving and accepting this Report and Recommendation; and (2) granting summary judgment in favor of Defendants.

DATED: March 10, 2017.